# In the United States Court of Federal Claims

No. 16-1569C
(Originally filed: March 15, 2017)
(Reissued: May 5, 2017)[1]

* * * * * * * * * * * * * * * * * *

TETRA TECH, INC.,

       *Plaintiff*,

v.

THE UNITED STATES,

       *Defendant*,

and

EASTERN RESEARCH GROUP, INC.,

       *Defendant-Intervenor.*

Post-Award Bid Protest;
Scope of Work; Work
Assignment.

* * * * * * * * * * * * * * * * * *

    *Holly A. Roth*, Washington, DC, with whom were *Lawrence P. Block*, *Elizabeth G. Leavy*, *Molly Q. Campbell*, and *Sarah S. Wronsky*, Washington, DC, for plaintiff.

    *Kristin B. McGrory*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, for defendant, with whom were *Chad A. Readler*, Acting Assistant Attorney General, Robert E. Kirschman, Jr., Director, *Douglas K. Mickle*, Assistant Director. *Maria S. Kavouras*, Office of General Counsel, United States Environmental Protection Agency, Cincinnati, Ohio, of counsel.

    *John G. Horan*, Washington, DC, for intervenor.

---

[1] This opinion was originally issued under seal pursuant to the protective order entered in this case. The parties conferred and proposed appropriate redactions of protected information. Those redactions are indicated herein with brackets.

————————————

OPINION

————————————

BRUGGINK, *Judge*.

Plaintiff, Tetra Tech, Inc., protests the United States Environmental Protection Agency's ("EPA") issuance of work assignment number 2-10, Long-term Stormwater and Wastewater Planning Technical Assistance (the "Stormwater Work Assignment") to intervenor, Eastern Research Group, Inc. ("ERG"), for the provision of stormwater and wastewater planning technical assistance. The Stormwater Work Assignment was issued to ERG under contract EP-C-14-014 (the "prime contract"). Plaintiff alleges that EPA violated the Competition in Contracting Act ("CICA"), 41 U.S.C. § 3301 (2012), when it issued the Stormwater Work Assignment because it materially departed from the scope of the original procurement for the prime contract, thereby requiring full and open competition.

Plaintiff further alleges that the work assignment under this prime contract looks suspiciously like work which plaintiff was performing on a completely separate contract, the renewal of which is the subject of a separate bid protest between the same parties. Plaintiff argues that EPA violated the voluntary stay in place in that other bid protest when it issued the Stormwater Work Assignment. *See Tetra Tech, Inc. v. United States*, Fed. Cl. No. 16-775 (the "16-775 protest"). In the 16-775 protest, plaintiff, there the incumbent contractor, challenges EPA's technical evaluations of both its and ERG's proposals and the subsequent award of the contract at issue (the "16-775 follow-on contract") to ERG. EPA agreed to a voluntary stay of the 16-775 follow-on contract in the 16-775 protest. It appears that the Stormwater Work Assignment could properly be issued under the 16-775 follow-on contract, and plaintiff argues that the stay has been violated by EPA's use of an improper contract vehicle to award the work to ERG. Our rejection of plaintiff's complaint in that related case is being issued simultaneously herewith.

The parties have cross-moved for judgment on the administrative record. Plaintiff asks the court to permanently enjoin ERG from performing the Stormwater Work Assignment under the prime contract. Oral argument was held on February 17, 2017. Because we find that the Stormwater Work

Assignment was within the scope of the prime contract's Performance Work Statement ("PWS"), we deny plaintiff's motion and grant defendant's and intervenor's cross-motions for judgment on the administrative record.

## BACKGROUND

In November of 2013, EPA issued a request for proposals (the "RFP" or the "solicitation"), seeking bids for the prime contract. The prime contract was a follow-on contract to EP-C-09-008, which was held by ERG and set to expire on February 13, 2014. The prime contract's stated objective was to "provide support services for the EPA's WaterSense program and other water efficiency efforts" through work assignments to be issued by the contracting officer in accordance with the PWS. AR 293. Funding for the work assignments were to be added through modifications as needed throughout the course of the contract.

The WaterSense program, launched in 2006, is "a voluntary public-private partnership program that seeks to protect the future of the nation's water supply by promoting water efficiency and enhancing the market for water-efficient products, services, systems, and practices." *Id.* The program helps consumers identify water-efficient products and programs, including high-efficiency toilets, weather-based irrigation controllers, and newly constructed homes, through its labeling program which indicates that the product or program meets or exceeds certain water-efficiency and performance criteria. The services that the contractor provides in support of the WaterSense Program and other water efficiency efforts under the prime contract include "(1) Market and Technical Research and Analysis, (2) Program Support and Implementation, (3) Marketing, Communications, and Promotional Support and (4) Support for Water Management and Sustainability Efforts." *Id.*

The solicitation was for a cost-reimbursement term contract with a 12-month base period followed by four 12-month option periods. Each year, EPA intended the contractor to perform 29,000 hours of work, but the agency would have the option to order an additional 10,000 hours per period. Spanning 14 pages in total, section 3.0 of the PWS presented the scope of work that could be required of the contractor. The scope of work was broken down into four subcategories: 3.1 Market and Technical Research and Analysis; 3.2 Program Support and Implementation; 3.3 Marketing, Communications, and Promotional Support; and 3.4 Support for Water Management and Sustainability Efforts. Sections 3.1, 3.2, and 3.3 were further broken down

into numerous, tertiary subcategories.

> Section 3.1 states that
>
> Market and technical research and analysis are vital to the
> success of the WaterSense program. This includes both an
> ongoing, general inquiry into the water-efficiency field, as well
> as more detailed research into potential areas for WaterSense
> labeling, targeting, or involvement. This market and technical
> research and analysis will support the EPA's decisions regarding
> the program's strategic direction (see section 3.2) and
> specification development (see section 3.1.3).

*Id*. Section 3.1.1 states that "[a]s a broad, ongoing activity, the contractor shall
be expected to perform research into water efficiency in general. This research
includes information on the current state of water-efficient technology, impacts
of water efficiency, calculators and other tools, and sector analysis." AR 293-
94.

> Section 3.2 provided that
>
> Watersense is a partnership program sponsored by the EPA that
> is designed to protect the future of our nation's water supply by
> promoting and enhancing the market for water-efficient
> products, new homes, and professional certification programs.
> The contractor shall support the EPA in the development and
> implementation of a program that is creative, relevant, and
> informative in meeting the needs of partners, allies,
> stakeholders, and the public. The contractor shall proactively
> provide recommendations on program structure and direction,
> as well as support in the implementation of those
> recommendations.

AR. 297. Section 3.2 of the PWS includes nine subtasks, which focus
predominately on implementation and support for the WaterSense program.
For example, section 3.2.2 explains that recruiting and supporting partners is
a key aspect of the WaterSense program and that, to that end, the contractor
would be required to "[d]evelop and implement a strategic approach to
recruiting new partners through mailings, meetings/conferences, etc; . . .
[s]upport, as appropriate, the completion and submission of partnership

agreements; . . . and [m]aintain a means of tracking all products, programs, practices, or systems that may be considered for inclusion in the program. . . ." AR 298-299.   Section 3.2.4 of the PWS further instructed that the "contractor shall continue to develop and modify the WaterSense website to ensure that it is up-to-date with respect to developments in the program." AR 299.  Section 3.2.7 notes that the program may engage in interagency efforts, and states that "the contractor shall be able to provide support on water efficiency issues associated with other sectors, including industrial, energy, and agriculture." AR 302.

Section 3.3 of the PWS described the following work to be performed:

Given that WaterSense is voluntary in nature, marketing and outreach are critical to the program's success.  These activities serve to attract partners, establish and promote the WaterSense brand, and build interest and credibility among consumers and other end users. As the EPA is developing strategies for marketing and promoting the WaterSense program, the contractor shall provide general marketing and communications guidance, expertise, and support.

AR 303.  Section 3.3 included seven subtasks that further elaborated what was required of the contractor with respect to general marketing and communications support for the WaterSense program.

Section 3.4, the pivotal section for this case, discussed potential work outside of the WaterSense program.  Considerably shorter than the previous three sections, section 3.4, in full, provided for the following work:

Provide support for water management and sustainability programs. This includes general research and detailed analysis in the areas of water conservation, efficiency, and reuse, particularly with respect to utility operations. Contractor support and research may include, but is not limited to:

a. Contribution to the development of the strategic direction of agency water management efforts by providing analysis, recommendations, and planning documents.
b. Development of tools and guidance to assist water utilities in water management and water reuse programs.

c. Development and/or assessment of water use efficiency metrics and benchmarks.
d. Identification and development of technological and behavioral approaches that will promote sustainable water management.
e. Providing regular management reports to track program progress.

AR 306.

The solicitation stated that EPA would award the contract to the offeror whose offer was most advantageous to the government with more weight given to the technical evaluation factors than cost. The solicitation listed eight criteria that EPA would use to "evaluate [an] offeror's technical proposal submitted to fulfill the requirements of the Performance Work Statement." AR 155. Listed in descending order of importance, the eight criteria included 1) Demonstrated Qualifications and Availability of Key Personnel, 2) Adequacy of Past Performance, 3) Technical Approach, 4) Demonstrated Corporate Experience, 5) Adequacy of Program Management Plan, 6) Small Disadvantaged Business Plan, 7) Adequacy of Quality Management Plan, and 8) Adequacy of General Security Plan for Confidential Business Information.

While fleshing out the technical evaluation criteria, the RFP makes a number of general references to the need to show experience or capability with respect to the type of work in the PWS.  The RFP also makes specific references to sections 3.1, 3.2, and 3.3. For example, the Demonstrated Qualifications and Availability of Key Personnel criterion is further broken down into a "Program Manager" section and a "Project Leaders" section, which included three project leaders: Engineering, Program Administration, and Marketing/Branding. Offerors were instructed to address the Engineering Project Leader's "knowledge of auditing and assessment procedures in accordance with the type of work specified in the PWS Section 3.1." AR 146. Offerors were also asked to demonstrate their Program Administration Project Leader's "knowledge of the tools and methods necessary to support [the] program . . . in accordance with the type of work specified in the PWS Section 3.2," which focuses predominately on implementation and support for the WaterSense program. AR 147. Finally, offerors were also asked to demonstrate their Marketing/Branding Project Leader's "experience in the communication and promotional support of a similar scale water or voluntary partnership program" and "competency in developing and managing

6

campaigns and outreach materials in accordance with the type of work specified in the PWS Section 3.3" *Id*.

The solicitation's technical evaluation criteria do not make a similar, direct reference to section 3.4 of the PWS.  This fact was discussed in an amendment to the solicitation on November 25, 2013, which included answers to technical questions posed by the offerors to EPA. Two questions were posed to EPA regarding the absence of a specific reference to section 3.4 in the technical evaluation criteria.

> QUESTION: Attachment 9, III Technical Approach mentions PWS 3.1 Market and Technical Research and Analysis, 3.2 Program Support and Implementation, and 3.3 Marketing, Communications, and Promotional Support. The PWS includes 3.4 Support for Water Management and Sustainability Efforts. Should PWS 3.4 be addressed in the Technical Approach? If so, what are the technical evaluation instruction and criteria for this task?
>
> . . .
>
> QUESTION: The key staff includes a Program Manager and three Project Leaders to support PWS 3.1, 3.2, and 3.3. Should the technical proposal include a Project Leader for PWS 3.4?

AR 310.  Both questions received the same answer: "This is the offeror's business decision on what to include in their proposal but must propose in accordance with the solicitation." *Id*.

ERG submitted its proposal on January 7, 2014. ERG's proposal largely focused on its ability to provide support for the WaterSense program.  In its cover letter, ERG stated that it "welcome[d] this opportunity to provide EPA with the same high level of technical expertise, responsiveness, and creativity that has characterized our work under our current contract to support EPA's WaterSense® program." AR 318. ERG assured EPA that it was "aware of EPA's water efficiency program requirements and [was] committed, throughout [its] entire proposed team, to meeting those requirements on time and within budget." AR 281. In its technical proposal, ERG addressed both the WaterSense program and ERG's capability to perform the tasks in sections 3.1, 3.2, and 3.3 in great detail. Compared to the other sections, ERG gave very

little attention to section 3.4, but it did address the section in its proposal. Specifically, ERG provided an example of how its program manager "worked closely with agencies and water utilities to explore municipally treated water reuse opportunities." AR 334.   ERG also addressed section 3.4 while discussing its technical approach, saying that its team is [

                                                                      ]. AR 405. ERG also noted its proposed team's "70 years of combined experience providing water management and sustainability support for large utility programs." *Id*.

     EPA awarded the prime contract to ERG on July 18, 2014.  Together, the base year and all option years had a total value of roughly $18.4 million. Consistent with the solicitation, the contractor would " perform work under [the] contract as specified in written work assignments issued by the Contracting Officer." AR 852.

     On October 11, 2016, EPA issued the Stormwater Work Assignment under section 3.4 of the prime contract. The Stormwater Work Assignment included the following Background/Objective section:

          Urban stormwater continues to be a growing source of water pollution, carrying pollutants and bacteria that can impact public health and causing and extensive flooding, property damage and habitat destruction. It also can overwhelm wastewater systems and overflow sewers, impeding communities' efforts to provide the reliable services that the public expects from their water infrastructure. . . . [M]unicipalities are working hard to communicate the value of their water resources and their efforts to protect them. They are looking for better ways to make smart infrastructure investments and improve community resiliency through sustainable, multi-benefit practices like green infrastructure.

          EPA is looking at ways to help communities make strategic, long-term investments in their wastewater and/or stormwater systems that yield strong environmental results. . . .

          EPA plans to set forth a cohesive narrative for good stormwater management that conveys the elements EPA would look for in

a community's long-term plan for stormwater. . . . These stormwater concepts can be used as part of integrated planning approaches or separately. The scope of an integrated plan can cover separate stormwater and wastewater systems or any combination of systems depending on the community's needs and objectives. . . .

This work assignment will include supporting technical assistance projects with up to five communities. The technical assistance will include meetings with communities, permitting authorities, and other federal, state, and local stakeholders. Support will be provided to communities as they develop draft long-term stormwater plans and engage in analyses and evaluations necessary to assess long-term stormwater and wastewater planning options in their communities. Ultimately a public outreach report will be developed for each technical assistance project that describes the project and highlights how the example, tool, or process can be applied to or implemented in the selected community as well as other communities.

As part of this technical assistance, communities will be "beta testing" the new stormwater planning concepts and a toolkit (to be shared by EPA), so support may also be needed in compiling comments from the beta testing and identifying opportunities to improve the tool. In addition, references and resource gaps/needs may be identified during the beta testing and the contractor may be asked to research possible tools and references that could be added to the toolkit in the future.

AR 1302-03.

In order to carry out the stated objectives, the Stormwater Work Assignment PWS listed a number of tasks for ERG to perform. Specifically, the contractor was required to prepare a detailed work plan and budget and provide monthly progress and financial reports to EPA. The Stormwater Work Assignment PWS also required that all the environmental data used be supported by an approved quality assurance project plan. The meat of the work assignment was to be carried out under "Task 1 - Technical Assistance Support." AR 1304. This task provided that the contractor would "provide technical support based on stormwater planning concepts and the Integrated

9

Planning Framework for five community partners." *Id*. The technical support task contained the following five subtasks, which are briefly described below: Meeting Support, Technical Analyses, Public Outreach Reports, Quick Turn-around Research and Technical Support Activities, and Communications Support.

For the Meeting Support task, the Stormwater Work Assignment PWS instructed that the "contractor shall prepare meeting agendas and submit for EPA review and approval 2 weeks prior to the meeting and deliver draft meeting notes as directed by the EPA [work assignment contracting officer representative ("WACOR")] for calls and meetings held with technical assistance communities and/or other stakeholder groups." AR 1304-05.

The Technical Analyses task required the contractor to "support technical analyses of stormwater and/or wastewater solutions," including analyses related to "identifying goals of long-term stormwater planning efforts . . . examining alternatives . . . and improving the long-term stormwater plan" among other areas. AR 1305. The task description goes on to describe that "[s]pecific analyses could include analyzing stormwater and/or wastewater challenges and suggesting design alternatives; evaluating stormwater design strategies; . . . optimizing green infrastructure; [and] . . . reviewing permit requirements" among other areas. *Id*.

For the Public Outreach Reports task, the Stormwater Work Assignment PWS stated that the "contractor shall develop a public outreach report or document for EPA for each technical assistance project that describes the project and highlights how the example, tool, or process can be applied to or implemented in the selected community as well as other communities." *Id*.

Under the Quick Turn-around Research and Technical Support Activities task, the contractor could be "asked to support quick turn-around tasks from time to time to assist EPA in responding to inquiries from management, technical assistance communities, and others." AR 1306. Deliverables under this subtask would be task-specific but could include "an email summarizing research findings on a certain topic, fact sheets, data tables summarizing information, . . . PowerPoint slides and/or graphics for meetings and presentations, and summaries of feedback from communities on the toolkit." *Id*.

Finally, for the Communications Support task, the contractor would be required to "provide support in developing communications materials such as graphics for [the] website, social media graphics, logo work, infographics, or fact sheets." *Id*.

On October 27, 2016, EPA approved amendment 1 to the Stormwater Work Assignment, which made minor revisions to the PWS without increasing the level of effort.[2]  That same day, EPA issued a press release regarding the Stormwater Work Assignment which discussed the work to be performed.  The press release announced the EPA's provision of "a step-by-step guide to help communities develop long-term stormwater plans, a web-based toolkit for the planning process, and technical assistance for five communities to develop plans as national models." AR 1792.  The release also identified the "five communities selected for $150,000 each in technical assistance to develop long-term stormwater management plans." *Id*. Plaintiff then filed suit on November 23, 2016.

## DISCUSSION

We have jurisdiction to render judgment on "an action by an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2012). Plaintiff alleges that the government violated CICA, 41 U.S.C. § 3301, when it issued the Stormwater Work Assignment without full and open competition.  In order to have standing, plaintiff must show that it is an "interested party" within the meaning of § 1491(b)(1). Plaintiff alleges that it is capable of performing the services acquired under the Stormwater Work Assignment and that it would have bid on the project if it were open to competitive bidding.  We are satisfied that plaintiff has standing to bring the present action.

Our review is limited to the existing administrative record generated in connection with the procurement. *See* RCFC 52.1. We review agency action in the bid protest context under the deferential standards of administrative review borrowed from the Administrative Procedures Act. *See* 28 U.S.C. § 1491(b)(4) (2012). EPA's actions can be enjoined only if we find them to have been "arbitrary, capricious, an abuse of discretion, or otherwise not in

---

[2] Among other changes, the amendment increased the number of communities to be assisted from four to five.

accordance with the law." 5 U.S.C. § 706(2)(A) (2012). The protestor bears the burden of establishing that the agency's decision lacked a rational basis or was otherwise in violation of applicable law or regulation. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

Plaintiff asks this court to permanently enjoin ERG's performance of the Stormwater Work Assignment, which was issued to ERG under the prime contract. In deciding whether a permanent injunction should issue, this court considers "(1) whether . . . plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).

We will first address the merits of plaintiff's claim. The primary argument in plaintiff's case is that EPA violated CICA by procuring services from ERG without the necessary competition. CICA demands "full and open competition through the use of competitive procedures." 41 U.S.C. § 3301(a)(1). This requirement should not be avoided by using the device of a contract modification. *See AT&T Commc'ns v. Wiltel, Inc.*, 1 F.3d 1201, 1204 (Fed. Cir. 1993); *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 791 (1997). Modifying the contract so that it materially departs from the scope of the original procurement violates CICA by preventing potential bidders from competing for what should be a new procurement. *See AT&T*, 1 F.3d at 1205; *VMC Behavioral Healthcare Serv. v. United States*, 50 Fed. Cl. 328 (2001).

To determine whether a modification is within the scope of the original solicitation, the court must compare the contract, as modified, with the scope of the competition conducted to achieve the original contract. *See AT&T*, 1 F.3d at 1205. Several factors may be considered. We will focus our analysis on whether the Stormwater Work Assignment materially departs from the scope of the prime contract, and whether potential offerors could have reasonably anticipated that stormwater management services were within the scope of the prime contract's solicitation.

Plaintiff contends that the Stormwater Work Assignment amounted to a cardinal change to the prime contract, thereby requiring full and open competition. According to plaintiff, the prime contract's PWS did not

12

encompass stormwater management services. To support its position, plaintiff directs the court's attention to the "Background" section of the PWS, which discusses the WaterSense program, its goals, and the possibility of adding new partnership categories to the program. Plaintiff also points out that, by its count, the PWS mentions "WaterSense" at least 64 times, "Water Efficiency" 15 times, but "stormwater" does not appear anywhere in the PWS. *See* Pl.'s Mot. for J. on the AR 25. Thus plaintiff concludes that the use of the term "water management" in section 3.4, when read in the context of the prime contract as a whole, does not include stormwater management services. In fact, plaintiff argues that "[t]he context of the contract's requirements demonstrates a clear intent for the contractor to perform services to support the WaterSense program alone." Pl.'s Reply 8.

In an effort to drive home its argument that the Stormwater Work Assignment is outside the scope of the prime contract, plaintiff goes to great lengths to draw a distinction between the WaterSense program and water efficiency, on the one hand, and stormwater management on the other. Plaintiff quotes the PWS to define the WaterSense program as "a voluntary public-private partnership program that seeks to protect the future of the nation's water supply by promoting water efficiency and enhancing the market for water-effcient products, services, systems, and practices." AR 293. Thus, plaintiff describes the WaterSense program and water efficiency as quantity-focused efforts by EPA to encourage consumers to reduce water consumption. In contrast, stormwater management is exclusively focused on water quality, predominately concerning the removal of pollutants that stormwater runoff collects as it flows over land and other surfaces, plaintiff argues. Plaintiff contends that, given the difference in focus, no potential bidder would have expected the Stormwater Work Assignment to fall within the scope of the solicitation.

Continuing its argument relating to the expectations of potential bidders, plaintiff also points to the fact that PWS section 3.4 was not expressly mentioned in the solicitation's technical evaluation criteria. This stands in direct contrast to sections 3.1, 3.2, and 3.3, which predominately relate to the WaterSense program and were required to be addressed in an offeror's technical proposal. Plaintiff further notes that, while ERG did address section 3.4 in its technical proposal, it did not directly mention its capability to perform support services related to stormwater management. Thus, according to plaintiff, ERG itself did not anticipate the possibility of a work assignment including stormwater support services.

In response, defendant and intervenor argue that the prime contract was elastic enough to include stormwater support services. Specifically, they argue that the language of PWS section 3.4 proves that the contract was not limited to the WaterSense program and alerted potential offerors that they could be asked to provide services in support of other water management programs. They also stress that the issuance of the Stormwater Work Assignment did not change the price of the prime contract, its period of performance, or the type of services to be provided, classic examples of an out-of-scope change.

While it is a close question, we conclude that the Stormwater Work Assignment did not materially depart from the scope of the original procurement, and as a result, EPA did not violate CICA by issuing that work under the prime contract. The listed objective of the prime contract's PWS states that "the contractor shall provide support services for the EPA's WaterSense program and other water efficiency efforts, including . . . (4) Support for Water Management and Sustainability Efforts." AR 293. Support for water management and sustainability efforts is the caption for section 3.4 of the PWS. Section 3.4 clarifies that this "includes general research and detailed analysis in the areas of water conservation, efficiency, and reuse." AR 306. Section 3.4 further states that this work could involve assistance with "the development of the strategic direction of agency water management efforts by providing analysis, recommendations, and planning documents. . . . [and the i]dentification and development of technological and behavioral approaches that will promote sustainable water management." *Id*.

We are satisfied that the language in section 3.4 of the prime contract—the stated authority for the Stormwater Work Assignment—can permissibly include stormwater management support services. To begin with, a plain reading of section 3.4 reveals that the solicitation and the resulting contract were not intended to be limited to services exclusively in support of the WaterSense program. While plaintiff is correct that the bulk of the contract concerns the WaterSense program, EPA expressly reserved the right to order work for other water management and sustainability efforts through section 3.4. As plaintiff quotes in its reply, an "interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous." *NVS Techs. Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004); *See* Pl.'s Reply 8 (quoting the same). If section 3.4, which makes no mention of the WaterSense program, did not contemplate work for other water management efforts, it is

14

difficult to see why that language would have been included in the contract. We also agree with intervenor that EPA's use of the plural "programs" and "water management efforts" was no accident. Given that we find section 3.4 permits work to be ordered in support of water management efforts outside the WaterSense program, plaintiff's arguments attempting to draw a distinction between stormwater management and the WaterSense Program/water efficiency are unavailing.

We also find that the Stormwater Work Assignment was "of a nature which potential offerors would have reasonably anticipated" based upon the language of the solicitation. *AT&T*, 1 F.3d at 1207 (quoting *Neil R. Gross & Co.*, B-237434, 90-1 CPD ¶ 212 at 2-3 (Feb. 23, 1990), *aff'd on reconsideration*, B-237434.2, 90-1 CPD ¶ 491 (May 22, 1990)). Under section 3.4, EPA alerted all potential offerors that it could order work including, but "not limited to . . . the development of the strategic direction of agency water management efforts." AR 306. It is not a stretch to say that a potential offeror could anticipate that "agency water management efforts," plural, would include stormwater management. *Id.*

The fact that the solicitation did not expressly require offerors to address section 3.4 in their technical proposals, while not irrelevant, does not change our conclusion. As discussed above, the offerors asked EPA how section 3.4 should be addressed in their technical proposals, if at all, and if they should include a project leader for the section. EPA informed the offerors that it was their business decision to decide what to include in their proposal. Plaintiff's line of argument with respect to ERG's technical proposal not including a reference to stormwater management directs the court's attention away from our primary inquiry, which is "whether the modification is of a nature which potential offerors would reasonably have anticipated." *AT&T*, 1 F.3d at 1207. This is an objective determination, viewed from the perspective of potential bidders for the first procurement—not from the perspective of ERG. *See CCL*, 39 Fed. Cl. at 791 (1997). While bidders' expectations may be informed by the requirements of the technical proposal, leaving the decision of whether to address section 3.4 to the offerors' business judgment did not change the fact that EPA could still award work under that section.

We also note that, as defendant and intervenor argue, the deliverables ordered in the Stormwater Work Assignment are consistent with the type of services discussed in section 3.4 of the PWS. For example, the Stormwater Work Assignment requires ERG to provide analysis related to "identifying

goals of long-term stormwater planning efforts . . . examining alternatives . . . and improving the long-term stormwater plan." AR 1305.  This plausibly connects to section 3.4, which, in relevant part, asks ERG to provide support and research, including "[c]ontributi[ng] to the development of the strategic direction of agency water management efforts by providing analysis, recommendations, and planning documents," and the "[i]dentification and development of technological and behavioral approaches that will promote sustainable water management." AR 306.  While it may not be much greater in size than a fig leaf, section 3.4 provides sufficient coverage.

Finally, plaintiff also alleges that the award of the Stormwater Work Assignment violated the voluntary stay of the 16-775 follow-on contract that the parties agreed to in the 16-775 protest. We disagree. To begin with, we note that such a claim should have been raised in the other protest. In any event, EPA did not violate the stay.  The agency issued the stormwater work through the prime contract and, as a result, did not use any funds from the 16-775 follow-on contract.  The scope of the voluntary stay does not include all work assignments that an agency could possibly issue under that contract. Such a rule would be unworkable for the agencies and invite unnecessary litigation.  We hold that EPA did not violate the voluntary stay when it chose an appropriate, unrestricted contract vehicle through which to issue the Stormwater Work Assignment.

## CONCLUSION

Plaintiff has failed to show success on the merits. Thus we need not consider the other factors required for injunctive relief.  Accordingly, we deny plaintiff's motion for judgment on the administrative record and grant defendant's and intervenor's cross-motions for judgment on the administrative record. The clerk's office is directed to enter judgment for defendant. No costs.


s/ Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

16